United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Olivier Caron, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 16-23065-Civ-Scola |
| | ) |
| NCL (Bahamas) Ltd. dba Norwegian | ) |
| Cruise Line, Defendant. | ) |

### **Order Granting Summary Judgment**

Plaintiff Olivier Caron, then 22 years old, was traveling as a passenger on a Baltic cruise aboard Defendant Norwegian Cruise Line's vessel, the *Star*. On the second day of the trip, Caron paid extra to purchase an all-inclusive drink package which allowed him unlimited beer and wine while on the cruise. After drinking beers at several different bars that evening, Caron first entered an area that was clearly marked with two signs: "CREW ONLY" and "RESTRICTED, CREW ACCESS ONLY." Two minutes later he opened an emergency-escape door with a red colored sign labeled "CAUTION only authorized crew beyond this sign." Upon going past that door, he fell several feet, through a hatch intended to serve as an emergency exit from the bow-thruster room below. Shortly after Caron emerged from the escape hatch, some four-and-a-half hours after his fall, he filled out a statement form presented to him by Norwegian. In response to the question, "Who [sic] do you blame the incident on?" Caron marked the box associated with "Myself."[1] (Stmt. Form Ex., ECF No. 123-1). Despite this acknowledgment, Caron nonetheless seeks to recover damages from Norwegian, submitting that Norwegian's negligence caused the injuries he sustained in the fall. Norwegian counters that the Court should grant summary judgment in its favor because: (1) Caron cannot show that the escape-hatch area was dangerous; (2) and, even if he could, Norwegian had no notice of the danger; and (3) Norwegian acted reasonably under the circumstances. (Def.'s Mot. for Summ. Judgment, ECF No. 125.) Because the Court finds Caron has not set forth sufficient facts upon which a reasonable fact finder could find on his behalf, the Court **grants** Norwegian's motion (**ECF No. 125**).

---

[1] A quote from Sophocles comes to mind: "It is a painful thing to look at your own trouble and know that you yourself and no one else has made it."

1

1. **Legal Standard**

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case*.*" *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, documents, depositions, answers to interrogatories, admissions, or other materials, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24; Fed. R. Civ. P. 56(c)(1)(A). The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Id.* at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Morrison*, 323 F.3d at 924.

2. **Factual Background[2] and Caron's claims**

After an evening of drinking with fellow passengers, Caron was intoxicated to the point that he felt "completely disoriented." (Pl.'s Stmt. of

---

[2] Unless otherwise noted, the following facts are undisputed.

Undisputed Mat. Facts, ¶¶ 32–39, ECF No. 281, 5–6.)[3] At some point, Caron wanted to go back to his room but, it appears, he got lost and ended up in one of the ship's crew areas instead. (*Id.* at ¶ 37.) The door Caron opened and walked through to get from the passenger to the crew area of the ship was clearly marked: "CREW ONLY"; "PASSENGERS USE IN CASE OF EMERGENCY ONLY"; "RESTRICTED"; "CREW ACCESS ONLY." (Def.'s Stmt. of Undisputed Facts, ¶ 3, ECF No. 125, 2; Door 1 Ex., ECF No. 114.) After entering the crew area, Caron proceeded down a hallway, or series of hallways, ultimately reaching another door which led directly into an escape hatch. (Def.'s Stmt. at ¶ 4; Door 2 Ex., ECF No. 115.) This door was also marked: "Emergency Exit"; "Do not obstruct"; "FIRE DOOR"; "KEEP CLOSED"; "CAUTION"; "Only authorized crew beyond this sign." (Def.'s Stmt. at ¶ 5; Door 2 Ex.) This door also had a square green sign on it, with white lettering, apparently identifying the door as "2 S." (*Id.*) There is some indication that there was supposed to be, or was, a chain across the doorway. However, Norwegian's corporate representative, Brett Berman, testified only that "as a matter of course, [the chain] is always in position, unless it's being used." (Brett Berman Dep. 339:18–340:16, ECF No. 113-1, 366–67.) And although the representative testified that "[t]he chain was across the doorway" he did not have any personal knowledge that it was actually there. (*Id.*) Caron testified that he did not remember a chain being there. (Olivier Caron Dep. 112:7–10, ECF No. 119-2, 112.) In any event, whether the chain was there or not, after opening and then proceeding through the marked doorway, Caron fell through the opening in the floor, directly in front of the doorway, hitting the deck below. About four-and-a-half hours later, Caron emerged, injured, from the hatch and was thereafter attended to by crewmembers and Norwegian's medical staff. (Supp. Attachment, Video 8, ECF No. 130.)

In his amended complaint, Caron lists twenty-one separate ways in which he alleges Norwegian was negligent. (Am. Compl., ECF No. 15.) Most of them relate to the alleged dangerousness of the emergency hatch itself (which the complaint describes as an "open manhole") as well as other "holes, areas, crevices, floors, walkways, and/or thresholds" on the ship. According to Caron, these areas were unsafe for a litany of reasons. For example, he says they were not properly inspected, cleaned, maintained, lighted, designed, protected, or covered. The complaint also alleges that Norwegian was negligent in allowing

---

[3] Norwegian continues to insist that, based on its interpretation of the Court's prior orders, any reference to Caron's alcohol consumption is immaterial and should not be considered. The Court has never said this and Norwegian is wrong.

access to the area where he fell and failing to properly warn of the area's hidden dangers.

### 3. Discussion

Federal maritime law governs the substantive issues in this case. *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990). In order to satisfy his burden of proof in this negligence action, Caron must show: (1) Norwegian had a duty to protect him from a particular injury; (2) Norwegian breached that duty; (3) the breach was the proximate cause of his injuries; and (4) he suffered damages. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012); *Hasenfus v. Secord*, 962 F.2d 1556, 1559–60 (11th Cir. 1992). "Each element is essential to Plaintiff's negligence claim and Plaintiff cannot rest on the allegations of [his] complaint in making a sufficient showing on each element for the purposes of defeating summary judgment." *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1236–37 (S.D. Fla. 2006) (Moreno, J.). "Regarding the breach element," in a negligence claim, "the benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition." *Frasca v. NCL (Bahamas), Ltd.*, 654 F. App'x 949, 952 (11th Cir. 2016) (quoting *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). Lastly, it should be noted that general maritime law is "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *See East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864–65 (1986); *see also Brockington v. Certified Elec., Inc.,* 903 F.2d 1523, 1530 (11th Cir.1990). Thus, "[i]n the absence of well-developed maritime law pertaining to [a plaintiff's] negligence claims, [a court] will incorporate general common law principles and Florida state law to the extent they do not conflict with federal maritime law." *Holderbaum v. Carnival Corp.,* 87 F. Supp. 3d 1345, 1349 (S.D. Fla. 2015) (internal quotations omitted) (Lenard, J.)

### A. Caron has not presented any genuine issue of material fact showing that the emergency escape hatch presented a danger to passengers.

As a threshold issue, a plaintiff must establish that a dangerous condition existed. However, "[t]he mere fact that an accident occurs does not give rise to a presumption that the setting of the accident constituted a

dangerous condition." *Reinhardt v. Royal Caribbean Cruises, Ltd.*, No. 1:12-CV-22105-UU, 2013 WL 11261341, at *5 (S.D. Fla. Apr. 2, 2013) (Ungaro, J.).

In his attempt to establish that the hole in the floor just behind the escape-hatch door posed a danger, Caron focuses on the lack of locking mechanisms on the doors that led to both the crew area generally as well as the hatch itself. He submits that it was unreasonable for Norwegian not to have locks on those doors and its failure to have them rendered the escape-hatch area dangerous. However, Caron did not present any evidence that not having a lock on the doors, which were covered in signs warning passengers to stay out, was unreasonable. Instead, Caron's expert, Richard J. Ferraro merely explained that, for example, "the door [to the escape hatch] *could have* been provided with a locking mechanism that *could have* prevented access from the corridor but still allowed escape in the designed direction of escape." (Richard J. Ferraro Dep.,[4] ECF No. 235-1, 5, 9 (emphasis added).) The expert's opinion that "a better way of dealing with places . . . where you can be injured," other than posting signs, "is to have the door locked" does not establish that, by *not* having the locks, Norwegian necessarily acted unreasonably. (Ferraro Dep. 81:9–11; 82:25–83:5 ("[T]here's no specific requirement to lock spaces, such as this. . . . But there's good reason to. And based on the regulations, one would think that would be the way to go."); 174:23–21 (in opining the door *should* have been locked, noting that "[m]ost hazardous spaces, if not all on a ship, are locked").) One can likely imagine any number of ways to more effectively protect passengers from their own carelessness and recklessness. For example, each passenger could be assigned his or her own chaperone. Or armed guards could be posted at each crew-area access point. Or maybe the signs could have been bigger, more colorful, or included pictures depicting holes in the floor. That Norwegian didn't have these things, and that one might argue these would be "better" ways of ensuring passenger safety, does not alone lead one inexorably to the conclusion that the escape hatch from the bow-thruster room, located entirely within the crew-only area, unreasonably exposed Norwegian's passengers to danger.

Further, to the extent Caron claims Norwegian breached its own internal, or other, standards by not locking the doors to the passenger area or the escape hatch, supporting evidence is lacking. That Erwin Castro, an assistant carpenter for Norwegian, stated in his deposition that he believes emergency

---

[4] Norwegian complains that many of the expert opinions Caron relies on in his motion were stricken by Judge Otazo-Reyes and should therefore be disregarded. Because consideration of these opinions would not change the Court's conclusion, the Court will in any event factor them into its analysis of Caron's opposition to Norwegian's motion for summary judgment.

5

hatches on the ship are generally locked, preventing access from the corridor, is insufficient to raise a genuine issue of material fact regarding whether Norwegian in fact has such a policy. (Erwin Castro Dep. 21:15–20, ECF No. 121-1, 22.) Additionally, Norwegian's corporate representative himself testified that it is not necessary to have a lock on the escape-hatch door. (Berman Dep. at 79:10–14.) Similarly, Caron's expert's inference that the crewmembers who were searching for Caron assumed the door was locked because they did not try to open the door to the hatch to look for him is equally unsupportive. (Ferraro Dep. 182:23–183:4.) Neither piece of evidence is significantly probative of whether Norwegian has a policy of making sure the escape-hatch doors are locked and inaccessible from the corridor. Further, Caron's prediction that his expert intends to testify that having locks on such doors is a recognized cruise-industry standard is unsupported by the record and insufficient, by itself, to establish a "specific fact" in opposing a motion for summary judgment. No matter how generously in Caron's favor the Court views the evidence he presents, the actual existence of any such policy, without more, is speculative. And such speculation cannot itself create a genuine issue of material fact.

In short, Caron has not presented sufficient evidence that the hatch posed a danger. In order to reach it, Caron had to pass through at least two doors marked with signs showing that he was entering an area meant for crewmembers only. Additionally, the first door had a clearly visible sign advising that it was for use by passengers only in the event of an emergency and that the area was "RESTRICTED":



(ECF No. 114-1, 2.) The second door, behind which lay the hole through which Caron fell, was clearly marked as an emergency exit. That door also had signs saying "KEEP CLOSED" and "CAUTION":



(ECF No. 115-1, 2.) The purpose of the escape hatch is to enable exit from a bow-thruster room, below deck, in the case of an emergency. (Def's Stmt. ¶ 11; Pl. Stmt. ¶ 11.) This emergency escape route and hatch are required under the International Convention known as the Safety of Life at Sea. (Def.'s Stmt. ¶ 12[5] (citing 46 C.F.R. § 2.01–25).) Upon opening the door to the hatch, the hole through to the deck below is also readily apparent upon the use of one's ordinary senses. (*See* Ex., ECF No. 116.)

In sum, other than the fact that he managed to fall through the hatch, Caron has not presented any evidence that the location and configuration of the emergency hatch was itself dangerous. Caron was in an area he was warned not to go into; once there, clearly marked signs advised him that he was opening a door that was itself an emergency exit; and once the door was opened, the hole in the floor was readily apparent. Additional warnings or safeguards, in this case, were not necessary when the hazard could "be appreciated by persons whose intelligence and experience are within the normal range." *Magazine v. Royal Caribbean Cruises, Ltd.*, No. 12-23431-CIV, 2014 WL 1274130, at *4 (S.D. Fla. Mar. 27, 2014) (Seitz, J.) (citing Restatement (Third) of Torts: Phys. & Emot. Harm § 18, cmt. f (2010)); *see also John Morrell & Co. v. Royal Caribbean Cruises, Ltd.*, 534 F. Supp. 2d 1345, 1351 (S.D. Fla. 2008) (Altonaga, J.) ("The obviousness of a danger and adequacy of a warning are determined by a 'reasonable person' standard,

---

[5] Caron marked this fact as disputed, pointing out that Norwegian's corporate representative testified "there's no circumstance . . . anyone could think of where people would be escaping into the bow thruster room in the event of an emergency." The cited quote does not refute Norwegian's statement and the Court thus considers it undisputed.

7

rather than on each particular plaintiff's subjective appreciation of the danger."); *Lancaster v. Carnival Corp.*, 85 F. Supp. 3d 1341, 1344 (S.D. Fla. 2015) (Moore, J.) (noting that a risk-creating condition is open and obvious when the hazard is "discernible through common sense and the ordinary use of eyesight").

**B. Caron has not presented any genuine issue of material fact showing that Norwegian had notice of the risk-creating condition.**

"[A]s a prerequisite to imposing liability," a plaintiff must establish that a shipowner "had actual or constructive notice of the risk-creating condition." *Keefe*, 867 F.2d at 1322. Here, even if Caron were able to show that the hatch area posed a danger, the record is devoid of any evidence that Norwegian had either actual or constructive notice of it. In fact, there have been no similar incidents on any ship within Norwegian's entire fleet in the five years before Caron's fall. (Def.'s Stmt. ¶ 31.)[6] Indeed, Norwegian submits that, according to its search, in the five years prior to the incident, "*not a single* passenger had ever reported being injured in the crewmember area of any Norwegian ship in a [manner] even remotely similar to the subject incident, let alone the subject emergency escape hatch or any similarly configured hatches." (Def.'s Mot. at 10 (emphasis in original).) Caron has not provided any evidence to the contrary. Nor has Caron submitted any evidence which could show that Norwegian had either actual or constructive notice that passengers were at risk of falling through the subject emergency escape hatch or any other hatch for that matter.

**C. Caron has not presented any genuine issue of material fact showing that Norwegian's crewmembers acted unreasonably under the circumstances.**

Caron insists Norwegian's crewmembers failed to exercise reasonable care when they came upon him in the crew-only area when he was "obviously visibly lost and intoxicated." (Caron Dep. at 108:21–22.) Even assuming Caron's testimony is true, that he was clearly lost and drunk, Caron has not carried his burden of properly raising a genuine issue of material fact as to the reasonableness of the crew's handling of the situation.

---

[6] Caron contends this statement is inaccurate because Judge Otazo-Reyes limited Norwegian's search to only passengers who fell in "hatches and chutes," complaining that Norwegian did not disclose all prior incidents of passengers who were injured when they entered crew areas. Nothing Caron presents, however, actually controverts Norwegian's declaration. The Court therefore finds it to be uncontroverted.

As seen in the CCTV footage submitted by Norwegian, Caron is first encountered in the crew-only area by two crewmembers at time-stamp 2:39:36 am.[7, 8] (Video 4, ECF No. 130.) One of those crew members, Negah Suardana, a worker in the housekeeping department, testified that he and his partner tried to talk to Caron but that Caron did not respond. (Negah Suardana Dep. 9:18–19, ECF No. 120-1, 9; Def.'s Stmt. ¶ 23.) Suardana also described Caron as running or walking away while he and his partner proceeded to call security. (*Id.* at 11:11–16; 31:7–10.) Caron does not dispute this but counters that none of the crewmembers he came upon actually offered to help him. (Caron Dep. 108:20–24; Pl.'s Stmt. ¶ 23.) Nor does he dispute that, when Suardana and his partner found Caron to be non-responsive to their inquiries, they immediately went about contacting security personnel. (Def.'s Stmt. ¶ 26.) Further, Norwegian has established that its security personnel arrived within a few minutes of Caron's first interaction with Suardana and his partner. In one of the videos submitted, Caron can be seen starting to run down a corridor at 2:40:45 am, just over a minute after passing by Suardana. (Video 6, ECF No. 130.) Another camera then shows Caron opening the door to the escape hatch and then disappearing from view at 2:41:06 am. (Video 7, ECF No. 130.) About two minutes later, Suardana appears, in the same area as the hatch, and he seems to be looking for Caron. (Video 7 at 2:43:49, ECF No. 130.) By 2:44:59 am, just over five minutes after Caron was first spotted in the crew-only area, security personnel are seen in the corridor outside of the escape hatch. There is no dispute that, between the time crewmembers first saw Caron in the crew area and the time that he fell through the hole in the escape hatch, only two minutes had elapsed.

Caron has not presented any evidence that Norwegian's crew acted unreasonably under the circumstances. Crewmembers like Suardana are trained that, should they encounter a passenger in the crew area, they are to attempt to speak with him or her, and, if the passenger does not respond, crewmembers are to call security. (Def.'s Stmt. ¶ 23.) This is exactly what happened. Only two minutes passed between Caron's first interaction with crew and the time that he fell through the escape hatch. Not long after their

---

[7] As noted by Norwegian, the time stamps on the provided videos are one hour behind actual ship time.

[8] Footage from another camera angle shows Caron leaning against the outside of a crew-area door in another area. (Video 1, ECF No. 130.) An unidentified crew member, exiting through that door, had to push against Caron, who eventually steps back, in order to open the door. Caron has not presented any evidence, however, that indicates that particular crewmember knew, or, based on what little interaction he had, should have known, that Caron was so impaired.

initial encounter with Caron, Suardana and his partner can be seen actively searching for him. Also during this time, just before his fall, Caron can be seen on the video footage, running through one of the corridors. On the one hand Caron's expert faults the crewmembers for losing visual contact of Caron right after they came into contact with him; on the other, however, the expert himself concedes that, during the two-minute window, between the first interaction and the fall, he didn't "see anything [the crew] did wrong." (Ferraro Dep. 142:9–11.) Caron's contention that the crewmembers could have physically blocked Caron's path and "[led] him back to the passenger area," without more, is unavailing. He has not presented any support showing that this is the standard of care for crewmembers like Suardana. And while it is certainly true that the two crewmembers "could have at least followed [Caron] and kept an eye on him," the evidence shows that, within a short period, indeed immediately, this is exactly what they attempted to do. That Caron outpaced them and then disappeared into an escape hatch before they could find him does not render their response unreasonable under these circumstances.

Caron's complaint that Norwegian's security personnel also acted unreasonably in searching for him is equally unavailing. By the time security personnel arrived, Caron had already fallen through the hole. The damage had been done. There is no allegation anywhere in the complaint that Caron's injuries relate in any way to the four-and-a-half hours he spent on the floor of the bow-thruster room; nor does Caron even raise this issue in his response to Norwegian's motion.[9] Thus any argument that security personnel breached their duty by calling off their search for Caron before he was found is misplaced. The same is true for Caron's allegation that Norwegian should have watched the entirety of the videos relating to the incident in order to determine where Caron had gone. Neither a continued search nor a full viewing of the footage could have prevented Caron's injury.

---

[9] The Court notes that Caron mentions the issue in passing in his reply to his spoliation motion: "At the very least, Plaintiff suffered additional pain and suffering because he was trapped in the 'escape hatch' for a longer period of time." (Pl.'s Reply, ECF No. 236.) Raising such an issue in this manner, without amending one's complaint, is inappropriate and therefore this claim is not properly before the Court. *C.f. Boone v. City of McDonough*, 571 F. App'x 746, 751 (11th Cir. 2014) (finding that claims raised for the first time in a response to a motion for summary judgment are not properly before a district court for consideration).

### 4. Conclusion

Caron has not presented sufficient evidence upon which a reasonable factfinder or juror could find on his behalf. He has not been able to establish support for any of the twenty alleged remaining bases for negligence as set forth in his amended complaint. The evidence submitted is insufficient to establish that there is a genuine issue of material fact as to whether Norwegian acted reasonably under the circumstances. Further, with respect to a number of allegations in Caron's complaint, the evidence is not only insufficient, it is nonexistent and borders, if not crosses, into the frivolous. A prime example is Caron's claim that Norwegian "fail[ed] to inspect, clean, keep and maintain its holes, areas, crevices, floors, walkways, and/or thresholds in a reasonably safe condition." (Am. Compl. ¶ 55a). Where is the evidence that Norwegian failed to clean anything? How does Norwegian's alleged failure to maintain its crevices, floors, walkways, or thresholds apply to any of the facts adduced in this case? Another example: Caron complains that Norwegian was negligent in "failing to use proper anti-slippery materials on its floors, walkways, or thresholds so as to prevent passengers or objects from slipping" (*id.* at ¶ 55i) and "failing to treat its floors, walkways, or thresholds to prevent them from being unreasonably slippery" (*id.* at ¶ 55j). How could these allegations possibly relate to this case?

Additionally, Caron's objections (**ECF No. 289**) to Judge Otazo-Reyes's order denying his spoliation claim (ECF No. 278) are specifically **overruled**. To begin with, after review, the Court does not find the order to be either clearly erroneous or contrary to law. Additionally, many of the issues raised in that order have been rendered moot by the instant order. And finally, many of the issues raised in the motion are not timely raised, despite the motion's having been filed before the pre-trial motion deadline. Caron received Norwegian's response to his interrogatories in November 2016. He deposed Norwegian's surveillance manager in April 2017. His motion for spoliation was not filed until almost four months later, in late July, which was three months after Norwegian had filed its motion for summary judgment.

In any event, based on the foregoing, there is no issue of material fact as to liability in this case and Norwegian is entitled to judgment as a matter of law. The Court therefore **grants** Norwegian's motion for summary judgment (**ECF No. 125**). The Clerk shall **close** this case. Any other pending motions are **denied as moot.** The calendar call set for **November 21, 2017** and the trial set for the trial period beginning **November 27, 2017** are hereby **canceled**.

11

**Done and ordered**, at Miami, Florida, on November 3, 2017.

_____
Robert N. Scola, Jr.
United States District Judge